# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW MEXICO

In re:

U.S. GLOVE, INC.,
a New Mexico corporation

       Debtor.

Case No. 21-10172-t11
Chapter 11 Proceedings

## DECLARATION OF RANDOLPH CHALKER
## IN SUPPORT OF FIRST DAY MOTIONS

I, Randolph Chalker, state that the following is true to the best of my knowledge, information, and belief:

1. I am an adult and I am authorized to submit this declaration (the "**Declaration**") on behalf of U.S. Glove, Inc. ("**U.S. Glove**" or the "**Debtor**") in connection with its voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code (the "**Case**").

2. I have personal knowledge of the facts set forth in this Declaration and the business affairs, operations, books and records, and financial condition of the Debtor. If called upon to testify, I would and could competently testify to the statements herein.

3. This Declaration is filed in support of the following motions (collectively, the "**First Day Motions**")[1] filed concurrently herewith for which the Debtor has requested a hearing on shortened notice to parties through a separate motion to the Court:

    (a)    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL APPROVAL OF THE USE OF CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION TO CERTAIN PRE-PETITION SECURED CREDITORS (the "**Cash Collateral Motion**"); and

---

[1] Capitalized terms not separately defined herein have the meanings ascribed to them in the applicable First Day Motion.

(b) DEBTOR'S EXPEDITED MOTION FOR AN ORDER AUTHORIZING MAINTENANCE OF THE DEBTOR'S EXISTING CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS (the "**Cash Management Motion**").

4. The Debtor commenced this Case on February 14, 2021 (the "**Petition Date**"). The Debtor remains in possession of its assets and continues to operate and manage its business as a debtor-in-possession pursuant to 11 U.S.C. § 1184.

## I. GENERAL BACKGROUND

### A. The Company

5. U.S. Glove is a New Mexico Corporation with its principal place of business located at 6801 Washington Street NE, Albuquerque, New Mexico. U.S. Glove manufactures high quality gymnastics and cheerleading hand and wrist support products, as well as other ancillary products, including wristbands, chalk, athletic tape, and grip brushes designed to enhance athletic performance. All manufactured products are made domestically in the United States. U.S. Glove relies on several key vendors to continue its operations and delivers its products all over the world.

6. U.S. Glove was founded in 1988 by Michael Jacobs ("**Jacobs**"), who previously owned 100% of the company. In October 2018, pursuant to a Stock Purchase Agreement and other related documents, Jacobs sold 57% of the issued and outstanding stock of the company. As a result, U.S. Glove is currently owned by Jacobs (43%), Evan Gobdel (16%), Greg Bregstone (16%), Gaye Gustafson (11%), and myself, Randolph (Randy) Chalker (14%).

7. U.S. Glove currently employs approximately 9 full-time employees and 6 independent contractors. I am responsible for the general administration of the Debtor and manage its day-to-day operations. My duties are, among other things, to monitor the Debtor's online orders and shipments, manage the Debtor's vendor relationships, manage monthly disbursements and obligations, make the weekly payroll to employees, and keep track of frequently received checks

and wire transfers from U.S. Glove's customers and accounts. The Debtor's principal assets consist of inventory, minor amounts of FF&E, and accounts receivable.

### B. The Debtor's Pre-Petition Secured Obligations

8. U.S. Glove is indebted to two parties on a secured basis. First, the Debtor is obligated to the U.S. Small Business Administration ("**SBA**") for an Economic Injury Disaster Loan in the amount of $150,000 (the "**EIDL**"). Second, the Debtor is obligated to Jacobs on account of a senior secured note ("**Senior Note**") pursuant to a note and related documents (the "**Prepetition Loan Documents**"). Prior to filing bankruptcy, the Debtor became delinquent on the Prepetition Loan Documents. As of the Petition Date, the balance owed on the Senior Note to Jacobs is approximately $2,279,715. The obligations owed to the SBA and Jacobs are secured by the Debtor's assets, including all inventory, equipment, accounts and other depository accounts, rights to payment, intangibles, and all products and proceeds of the foregoing (the "**Cash Collateral**").

### C. Events Precipitating the Bankruptcy Filing

9. U.S. Glove has historically enjoyed net operating profits. However, it has recently experienced a drastic decline in revenues and profits from reduced retail and online sales due to the COVID-19 pandemic and its impact on the gymnastics and cheerleading industries. Many of the Debtor's customers are small family-owned gymnasiums whose businesses have either permanently closed or have been significantly impaired due to COVID-19 regulations imposed worldwide. Further, U.S. Glove's direct sells to athletes has also declined drastically. Gymnastics competitions have been canceled worldwide and the Debtor anticipates its business will be impacted by the effects of COVID-19 for years to come.

10. The unanticipated events of the previous year have contributed to U.S. Glove's

recent difficulties and have threatened its financial stability and ongoing operations. The Debtor has requested and received relief from the SBA through the Paycheck Protection Program ($100,250)[2] and the EIDL program ($150,000) to stay afloat during the pandemic and survive through the current economic conditions. However, the substantial decline in sales and its uncertain future has caused the Debtor to miss principal and interest payments on Jacob's Senior Note and other pre-petition obligations.

## II. THE DEBTOR'S OPERATIONS IN BANKRUPTCY

11. The Debtor plans to continue to manufacture and sell its products in the ordinary course of business during this Chapter 11 Case. The Debtor intends to reorganize under a feasible Subchapter V Chapter 11 plan that will allow it to restructure its debts, keep its business operating, retain employees, and maximize value to the estate.

## III. FACTS IN SUPPORT OF FIRST DAY MOTIONS

12. The Debtor has filed the First Day Motions. The Debtor requests that the Court grant each of the First Day Motions described below as they constitute a critical element in ensuring that the Debtor's operations are not disrupted, and the Debtor can successfully reorganize.

### A. The Cash Collateral Motion

13. Expenditures of Cash Collateral will preserve and maintain the Debtor's manufacturing operations, which will allow the Debtor to continue providing additional adequate protection to its properly perfected secured creditors.

14. The Debtor requires immediate use of Cash Collateral to sustain business operations. Namely, the Debtor needs to make its weekly payroll, pay trade vendors, shipping, advertising and related costs and expenses, and continue to pay its rent. The Debtor needs to make

---

[2] Debtor has received two rounds of PPP disbursements. $41,250 of the original $50,250 PPP loan has been forgiven. The Debtor received a second $50,000 PPP loan on February 1, 2021. Total balance owed is $59,000.

4

its payroll at this critical juncture to ensure that critical employees are not lost. Many manufacturing businesses rely heavily on their workforce, and the Debtor is no exception. Its employees are trained in rather technical glove manufacturing processes and finding replacement employees would be costly and time consuming.

15. Further, the Debtor needs to remain current on payments owed to its vendors and other trade creditors who are crucial to the Debtor's business as a going concern. Without immediate access to the Cash Collateral, the Debtor's operations will be brought to a halt, resulting in immediate and irreparable harm to the Debtor and its stakeholders, including its employees, as well as its estate and creditors.

16. The Debtor's cash projections show that the value of its secured creditors' security interests in Cash Collateral will remain stable throughout the initial stages of this Chapter 11 Case during the proposed Cash Collateral Period. The interests of the SBA and Jacobs will be best served by permitting the Debtor to use Cash Collateral and provide the Adequate Protection stated in the Cash Collateral Motion.

17. Although the short term cash flow is stable, at times, U.S. Glove will have less than $50,000 of operating cash on hand at the end of the 13 week forecasted cash period. Ideally, cash reserves in a healthy situation would be above $50,000.

18. Despite this, under the circumstances the Debtor believes that monthly cash payments of $5,000 as adequate protection to Jacobs are appropriate. This amount provides a benefit to Jacobs, yet will not place the Debtor in a situation where it does not have sufficient cash to operate during the course of this Case.

B. The Cash Management Motion

19. In the ordinary course of business, the Debtor has developed a cash management

5

system with respect to its internal operations, and its online orders and payment processing system (the "**Cash Management System**") that plays a vital role in its current operations and revenues. The bulk of the Debtor's business and transactions are performed online. Any disruptions to its Cash Management System will cause great harm to the Debtor's bottom line and in turn, to its creditors and the bankruptcy estate.

20. Prior to its Petition Date and as of the filing the Cash Management Motion, the Debtor, in the ordinary course of business, maintains three bank accounts at Bank of America (collectively, the "**Bank Accounts**"):

(a) <u>Disbursement and Receipts Account.</u> The Debtor maintains a business checking account at Bank of America ending in account no. 7637 (the "**Main Operating Account**"), which receives funds from online sales, and is used to deposit physical checks and accept wire transfers from its reoccurring customers. The Debtor has approximately 50 vendors/customers that use the Main Operating Account to make payments the Debtor and receive payments from the Debtor. The Main Operating Account is also set up to automatically pay the Debtor's monthly financial obligations, which allows the Debtor to remain current on its monthly bills. The Main Operating Account has been in use for over five years.

(b) <u>International Wire Transfer Account.</u> The Debtor maintains a second business checking account at Bank of America ending in account no. 5371 (the "**International Wire Account**"), which receives wire transfers from overseas customers. The Debtor prefers to utilize the International Wire Account for such customers to protect the security of its Main Operating Account. The International Wire Account has been in use for over five years.

(c) <u>Payroll Account.</u> The Debtor maintains a third business checking account at Bank of America ending in account no. 8031 (the "**Payroll Account**"), which is strictly used to pay its employees on a weekly basis. The Debtor also uses the Payroll Account to keep track of its Payment Protection Program funds used to make payroll and satisfy other qualified business-related expenses. The Debtor typically funds the Payroll Account from either its Main Operating Account or the International Wire Account as appropriate. The Payroll Account was established in April of 2020 once the Debtor received its first PPP loan.

21. In the ordinary course of business, the Debtor utilizes the Cash Management System to collect and disburse funds generated by the operations of the Debtor. The Cash Management System allows the Debtor to monitor the collection and disbursement of funds and maintain control over the administration of its Bank Accounts. The Cash Management System is

not entirely automated and requires me to monitor the system, manage the proper monthly disbursements, and keep track of frequently received checks and wire transfers from our biggest customers and accounts.

22. The Debtor generates and receives funds from three main sources: (1) the widely known e-commerce company, Shopify; (2) PayPal; and (3) physical checks and wire transfers. Any changes to the current Cash Management System, no matter how minimal, will disrupt the Debtor's cash collection methods due to the Debtor's reliance on Shopify's payment nuances.

23. Shopify plays a vital role in processing the bulk of the Debtor's online sales. Shopify collects the online payments, which are then swept every few days into the Main Operating Account. On average, such payments are in excess of $5,000/week.

24. Some of the Debtor's retail and dealer customers also use PayPal to make online payments. These payments are also swept into the Main Operating Account much like the Shopify payments and average a total of $3,000 per week.

25. Other cash collection methods are through physical checks and wire transfers from its biggest and most reoccurring customers. The Debtor deposits these checks into the Main Operating Account. All domestic wire transfers are also sent to the Main Operating Account. All international wire transfers are sent to the International Wire Account.

26. Receipts held, swept, or wired to the Main Operating Account are used by the Debtor to satisfy its financial obligations. The Debtor pays approximately 80% of its vendor invoices through online payments or the American Express card and the other 20% through physical/ online bill payment checks.

27. As of the Petition Date, the Debtor has no uncleared checks, wire transfers, or other funds in transit to a third party; further, there are no regularly recurring wires or auto-withdrawals

that will cause a pre-petition claim to be paid.

28. The Debtor uses an American Express credit card ("**AMEX**") to satisfy the shipping costs incurred through the Shopify platform. Shopify requires a credit card be used for processing, and shipping payments are made on a weekly basis. The AMEX statements are due at the end of each month, providing the Debtor with cash flow flexibility to remain current on its shipping payments to Shopify. The AMEX is also used to satisfy other reoccurring monthly bills alongside the Shopify shipping bills. The AMEX statements are paid on time via auto pay linked to the Main Operating Account. It is critical for the Debtor to continue using its AMEX as part of its Cash Management System to prevent any disruptions to the Debtor's monthly financial obligations, and to continue real-time shipping for all Shopify transactions.

29. Leading up to the Petition Date, the Debtor has paid the AMEX balance off regularly such that no amounts are due and owing to AMEX as of the Petition Date. Therefore, any future payments to AMEX during this case will not cause payment of a pre-petition claim.

30. The Cash Management System is integrated with the Debtor's longstanding accounting practices that enables me to monitor finances and online orders. Dismantling the Cash Management System would disrupt the Debtor's day-to-day operations and would effectively take the business offline for a period while I work to integrate its online platforms with new bank accounts.

31. I, as the Debtor's administrator, lack the administrative support to change the Cash Management System in a timely manner that would not impair the Debtor's ability to generate revenues and continue its operations without disruptions during the Debtor's transition to this Chapter 11 Case as a debtor-in-possession.

32. Dismantling the Cash Management System would force the Debtor to halt its online

8

Case 21-10172-t11    Doc 16    Filed 02/15/21    Entered 02/15/21 13:38:45 Page 8 of 9

transactions to the detriment of the bankruptcy estate and its creditors. Additionally, the Debtor's payroll system would fall behind and cause delays in payments to the Debtor's employees. It would be very time consuming, costly, and difficult for the Debtor to establish an entirely new system and bank accounts. Moreover, Shopify has historically required the Debtor to link a credit card (and not a debit card, presumably for security purposes) for the corresponding shipping costs associated with each placed order.

33. Under these circumstances, continued use of the Cash Management System, the Bank Accounts, and the AMEX card are essential and clearly in the best interest of the Debtor's estate. Preserving the "business as usual" atmosphere is critical to allowing the Debtor to maximize the value of its estate in these Chapter 11 proceedings.

34. By avoiding the disruption and delays to the Debtor's disbursements that would result from closing the Bank Accounts and opening new accounts, all parties in interest, including the Debtor's vendors, employees, and administrative creditors, will be best served by preserving the Debtor's ability to continue its normal business operations. The confusion that would ensue, especially for reoccurring customers and vendors, absent the relief requested herein would substantially hinder the Debtor's restructuring efforts.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this Declaration was executed on February 15, 2021.

*Randolph N Chalker*
Randolph Chalker
Authorized Representative
U.S. Glove, Inc.